UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE | |
|---|---|---|
| Paul M. Cruz | | N/A |
| Deputy Clerk | | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| N/A | | N/A |

**Proceedings:** FINDINGS OF FACT AND CONCLUSIONS OF LAW

This memorandum constitutes the Court's findings of fact and conclusions of law following a bench trial held on October 1 and 2, 2013.

## I. INTRODUCTION

On May 30, 2013, the American Humanist Association, Diana Hansen, and John Larsen ("Plaintiffs" or "AHA") filed a complaint against the City of Lake Elsinore, Daryl Hickman, Natasha Johnson, Steve Manos, and Brian Tisdale (collectively, "Defendants"). (Dkt. 1). Plaintiffs assert that a veterans-memorial design approved by the Lake Elsinore City Council violates the First Amendment's Establishment Clause of the United States Constitution and the Establishment, No Preference and No Aid to Religion Clauses of Articles I and XVI of the California Constitution. (Compl. ¶ 1). On October 1, 2013, the Court conducted a bench trial. (Dkt. 75-77). After review of all of the evidence and arguments, the Court finds that the Lake Elsinore memorial violates both the U.S. Constitution's Establishment Clause and the Establishment and No Preference Clauses of the California Constitution. The Court declines to consider whether the memorial also violates California's No Aid to Religion Clause.

## II. CONCLUSIONS OF FACT

On April 24, 2012, the Lake Elsinore City Council first discussed the idea of building a veterans' memorial to honor a member of the community who was killed in Afghanistan. (Melendez Decl. ¶ 2; Snider Decl., Ex. D (City Council Meetings Transcript ("Transcript"), at 3:25 to 4:25)). After

| | : | |
|---|---|---|
| | Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

discussion, the Council decided that rather than honoring a single soldier, a memorial should be constructed to honor all Lake Elsinore veterans. (Magee Decl. ¶ 2). At the July 10, 2012 City Council meeting, a Design Committee was established. (Tr. at 30:8-11). The Council gave the Design Committee general directions, including a desire that the memorial be placed in front of the City's minor league baseball stadium to increase viewership. The Council did not direct the Design Committee to develop a faith-based theme or to include religious symbols. (Id. at 30:8-11). The Design Committee consisted of approximately twenty members, including Lake Elsinore's Mayor (Brian Tisdale); representatives from various local veterans' groups; and a representative of the City's minor league baseball team, which plays in the stadium eyed as the site for the memorial. (Carlson Decl., ¶ 2). Sun City Granite was selected to help design and construct the memorial.

Mr. Tisdale testified that at the Design Committee's first meeting, the Committee started with a blank slate and that there was debate about most of the individual components for the memorial. Based on what the Committee members described, a member of Sun City Granite then sketched out a design. The design that was overwhelmingly embraced included the following components:

The main piece, in the center of the memorial, is an approximately 5 feet tall slab of black granite in the shape of a vertical rectangle with a semi-circle top. This piece is placed on top of two horizontal slabs of granite, the bottom slab slightly longer than the top slab, and together adding approximately 1 foot in height, for a total height of 6 feet. (Trial Ex. 23; Carlson Decl., ¶ 3). On the front of the vertical granite slab is an image of a kneeling soldier leaning on his rifle at a grave. (Tisdale Decl., ¶ 11). The tombstone is in the shape of a Latin cross. (Id. ¶ 13). Both the solider and the cross are completely white, and stand out against the black granite background. (Trial Ex. 5-1). The cross is approximately 1.5 feet in height. (Trial Ex. 23). Above the soldier is a gray-colored American flag, and a soaring eagle in the top right corner. (Id.). In front of the flag are eight lines of text, reading "Honoring Brave Men and Women Who By Their Sacrifice Give Life To Our Most Precious Gift-- Freedom." (Tisdale Decl., ¶ 39). On the two granite steps beneath the vertical granite piece, the memorial reads in large letters: "Freedom Is Never Free." (Id.). "POW MIA" appears on the back side of the granite tombstone-shaped piece. (Id.). In a semi-circle behind the memorial's primary piece are five granite pedestals, each displaying the emblem of one of the five branches of service: Army, Navy, Air Force, Marines, and Coast Guard. (Id.).[1]

Mayor Tisdale testified that at no time during the design selection meeting did the Committee

---

[1] Images of both the first iteration of the monument, and the second iteration, which was actually approved, appear at the end of the order respectively in Appendices A and B.

| | : | |
|---|---|---|
| | Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | | Date | February 25, 2014 |
|---|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | | |

suggest that the selected design was meant to be a religious work. (Tisdale Decl., ¶ 9). Tisdale also testified that he did not recall the Committee focusing much on the cross itself; rather, certain pictures of art were displayed and the image the Committee selected was the solider kneeling at a grave site with a cross gravestone.

On October 23, 2012, the Design Committee's proposed design was presented to the City Council. (Transcript, 33:21-22). During public comment, certain members of the community criticized the proposed design, questioning the inclusion of the cross-shaped tombstone, as well as the stadium location. (Id. 35:1-40:8). The City Council members responded by expressing frustration with the comments on the cross. Mayor Pro Tem Hickman stated: "I feel sorry for us that we as Christians cannot show the cross because of the First Amendment. Okay. It really is a shame that our society, to me, is leaning that way." (Id. 43:19 to 44:1). Council Member Melendez then stated that she was "disappointed in the turn of events," and stated that "it is a sad reflection on our society when as a Christian nation, one of the principles upon which we were founded, is something that we are forced to hide." (Id. 45:9-20). Mayor Tisdale stated that "it upsets me that we have to play the pettiness of the cross and talk about the Christianity of it." (Id. 49:8 to 50:8).

During the discussion, Council Member Melendez asked the City Attorney, who was present, if the cross would be a legal problem. (Id. 52:22-24). The City Attorney responded that it was an issue and that if he had to give a yes or no answer it would be that the cross could not be on the memorial. (Id. 52-53). Council Member Melendez then stated: "You know what, . . . I think at some point you have to take a stand. I'm sorry. I just think you do. And I'm going to make a . . . motion that we approve this project as is." (Id. 54:15-19). In response to a separate motion to continue the decision on the memorial, Mayor Pro Tem Hickman stated: "I'm not going to sit here and wait for people to denigrate my beliefs, okay. . . . We don't have to change it." (Id. 51:6-11). The Council eventually accepted the motion to continue the vote until after the Committee had an opportunity to reevaluate the design. (Id. 54:24 to 55:4).

The Design Committee met again on November 2, 2012. (Tisdale, Ex. A). The Committee voted to keep almost all components of the memorial the same. However, instead of having a solitary gravestone in the shape of a cross, the Committee voted to add additional grave markers. (Carlson Decl., ¶ 6). The revised memorial design still featured a soldier kneeling with his gun in front of a 1.4 foot cross, but also included a row of approximately eight additional crosses and two Stars of David behind the central cross. (Trial Ex. 23).[2] The Design Committee explained the modified design in a

---

[2] An image of the modified memorial design can be found at the back of this opinion. See Appendix B.

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

report to the City Council, which stated that "[t]he monument includes a historical depiction of a World War II era soldier at a cemetery kneeling at the grave of a fallen comrade." (Tisdale Decl., Ex. A, at 2).

A few days before the next City Council meeting, Joyce Hohenadl, a member of the Design Committee, sent an email to other Committee members encouraging them to attend the upcoming City Council meeting. Ms. Hohenadl stated: "I am afraid if we do not attend the Lake Elsinore City Council meeting this coming Tuesday, Nov. 13, at 7:00 p.m., we may lose any religious symbols on the memorial. All people who were attending the last meeting need to attend the city council meeting." (Trial Ex. 20).

At the November 13, 2012 City Council meeting, the Design Committee proposed the modified design with the row of crosses and the Stars of David. (Tisdale Decl., Ex. A). At the meeting, eight individuals from the community spoke about the memorial. Many of the speakers wore large crosses around their necks during their testimony. (Trial Ex. 1).

Ms. Hohenadl stated that "[o]ur ancestors came to this country with their Christian Judeo faiths. . . . [T]he monument depicts a World War II era solider with gravestones of soldiers featuring both a Christian cross and a Star of David; therefore, it has historical value to it." (Tr. at 60-61). Debbie Rodriguez, a retired Marine, addressed the Council and said that "[t]he cross made [her] proud to serve [her] country, which was founded on Christianity," and that "God is the cross for me. . . . It could be other things to other people." (Id. 62: 21-24). Ms. Rodriguez also stated that "the handful of people who disagree with [having the cross on the memorial] probably never served a day in uniform, never served this country, never served what this country was founded for, never served what we believe in." (Id. 63: 6-10). One member of the community spoke against having the cross on the memorial, which she felt excluded veterans of other faiths. (Id. 63: 16-25). Soon after, however, another Marine veteran stated that "[f]or so few in this city--and I mean few. . . . to think that they're going to have the power and not have been in the military, I don't know where they came from. They must have come from a third-world country and come over here and just want to start stuff." (Id. at 68:17-22). He then concluded "[t]hese people need to go and find a place to live other than America." (Id. 69:18-19).

After the public comments, the City Council members spoke. Council Member Weber stated that "I think that when [people] look at [the memorial], they just see someone who is thinking about lost comrades more than anything else." (Id. 79:8-11). Council Member Melendez stated that the memorial "honored all veterans, no matter your faith, or whether you even have one. . . . This has nothing to do with religion. This is an accurate historical depiction of a World War II soldier kneeling at a grave site paying tribute to a fallen comrade." (Id. 79:23 to 80:2). Council Member Magee expressed support for the memorial design, and said that "what got to [him] the most" was "Deborah Rodriguez . . . talking

| | : | |
|---|---|---|
| | Initials of Preparer | PMC |

Case 5:13-cv-00989-SVW-OP Document 85 Filed 02/25/14 Page 5 of 20 Page ID #:1096

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

about her cross and her time served and her son." (Id. 83: 4-9). Mayor Tisdale stated he did not "necessarily subscribe to any particular religion," and that he looked at the memorial design as "a historical thing, honoring our Veterans." (Id. 83:18-21).

After the comments, the Council voted and unanimously approved the memorial's design. The memorial would be paid for by the City in the amount of $46,172.30. (Tisdale Decl., Ex. A, at 4).

**III. CONCLUSIONS OF LAW**

A. United States and California Establishment Clause Provisions

Plaintiffs' contend that Lake Elsinore's proposed veterans' memorial violates both the Establishment Clause of the U.S. Constitution, and the Establishment and No Preference Clauses of the California Constitution.

Under the doctrine of constitutional avoidance, federal courts are generally required to avoid interpreting the federal Constitution if alternative grounds exists. This is so even if the alternative grounds are based on interpreting a state's constitution. See Ellis v. City of La Mesa, 990 F.2d 1518, 1524 (9th Cir. 1993) ("[f]ederal constitutional issues should be avoided when the alternative ground is one of state constitutional law."). However, "[w]here the state constitutional provisions are co-extensive with related federal constitutional provisions, [courts] may decide the federal constitutional claims because that analysis will also decide the state constitutional claims." Vernon v. City of Los Angeles, 27 F.3d 1385, 1292 (9th Cir. 1994).

California's Establishment Clause is coextensive with the U.S. Constitution's Establishment Clause. The U.S. Constitution prohibits any law "respecting an establishment of religion." U.S. CONST. amend I. And in virtually identical language, the California Constitution states that "[t]he Legislature shall make no law respecting an establishment of religion." Cal. Const. Art. I, § 4. Although the California Constitution is a document of "independent force," the California Supreme Court has noted that the intent and purpose of the "establishment" provision is the same, and there is no cogent reason for analyzing the clauses differently. See East Bay Asian Local Dev. Corp. v. State of California, 24 Cal. 4th 693, 718-19 (2000) (holding that because a landmark preservation law did not violate the First Amendment based on an analysis of the factors set forth in the U.S. Supreme Court's decision Lemon v. Kurtzman, 403 U.S. 602 (1971), that the law also did not violate California's Establishment Clause).

Article I, Section 4 of the California Constitution, however, also guarantees the "[f]ree exercise

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

and enjoyment of religion *without discrimination or preference*." Cal. Const. Art. I, § 4 (emphasis added). This provision has been referred to as the No Preference Clause, and there is an absence of similar language in the U.S. Constitution. See Vernon, 27 F.3d at 1395. At times, California courts have suggested that the No Preference Clause may be broader than the Establishment Clause of the U.S. Constitution. See Okrand v. City of Los Angeles, 207 Cal. App. 3d 566, 571 (1989) ("California's constitutional provisions [addressing religion] are more comprehensive than those of the federal Constitution."); Fox v. City of Los Angeles, 22 Cal. 3d 792, 796 (1978) ("Preference thus is forbidden even when there is no discrimination. The current interpretations of the United States Constitution may not be that comprehensive."). Under these holdings, government action could conceivably violate California's No Preference Clause without violating the First Amendment's Establishment Clause.

     Based on the understanding that the No Preference Clause is broader than the First Amendment, the Ninth Circuit has at times held that for purposes of federal constitutional avoidance, courts should first determine whether government action violates the No Preference Clause before addressing whether the action violates the U.S. Constitution. See Ellis, 990 F.2d at 1524 (holding that two cross monuments and an official city seal featuring a cross violated the No Preference Clause and determining that because the items violated the California Constitution that there was no need to address whether they also violated the federal Constitution); Hewitt, 940 F.2d at 1565 (holding that a display of religious statues in a park violated the No Preference Clause, and avoiding the First Amendment issue).

     There are few California cases, however, interpreting the No Preference Clause. Only once has the California Supreme Court interpreted the provision as it applies to religious displays, see Fox, 22 Cal. 3d at 792 (holding that a city's use of a large Latin cross to illuminate its city hall's windows at Christmas time violated the No Preference Clause), and only one California Court of Appeal decision has similarly analyzed the clause as it applies to religious displays. See Okrand, 207 Cal. App. 3d at 566 (holding that a city's display of the historic Katowitz menorah in its rotunda during the holidays, along with a Christmas tree, did not violate the No Preference Clause). In Okrand, the court acknowledged that "California cases addressing [the No Preference Clause] are few," and noted that courts should also "consult principles of federal cases as they seem compelling guides to uncharted state grounds." Okrand, 207 Cal. App. 3d at 571; see id. (relying extensively on the U.S. Supreme Court's analysis in Lemon v. Kurtzman, 403 U.S. 602 (1971) in its holding that the city's display of the Katowitz menorah did not violate the No Preference Clause).

     More recently, the California Supreme Court has actually avoided differentiating the No Preference Clause from the U.S. Constitution's Establishment Clause. In East Bay, the California Supreme Court noted that it "has never had occasion to definitively construe the no-preference clause," and implicitly rejected that the No Preference Clause provides a broader guarantee of separation of

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

church and state than the First Amendment. East Bay, 24 Cal. 4th at 719. In considering challenges to a law that exempted religious property from landmark status, the Court in East Bay held that because the landmark preservation law satisfied all prongs of the U.S. Supreme Court's Lemon test, that "it follows that the exemption is neither a governmental *preference* for or discrimination against religion" under the California Constitution. Id. (emphasis added). The California Supreme Court thus equates compliance with Lemon and the U.S. Constitution's Establishment Clause with compliance under the No Preference Clause.

The Lemon test remains the general standard for analyzing Establishment Clause cases under the U.S. Constitution. See Trunk v. City of San Diego, 629 F.3d 1099, 1106 (9th Cir. 2011). And because the California Supreme Court in East Bay found the Lemon test to also govern the analysis under California's Establishment and No Preference Clauses, this Court applies the Lemon test to both the state and federal constitutional issues in question in the instant case. Although some other federal courts have also considered the California cases Fox and Okrand in analyzing California's No Preference Clause, the Court does not find these decisions instructive in the instant case. Neither Fox nor Okrand addresses an instance where government actors make religiously supportive comments in relation to a religious display (as occurred here). Nor do either of these decisions consider a case where the context surrounding a religious display includes numerous statements of religious support by members of the community (as also occurred here). These factual differences are significant, and as a result the Court relies instead on Lemon and federal case law interpreting and applying Lemon. Because the Court determines that Lemon is the relevant standard to apply to both the state and federal constitutional claims, applying the doctrine of constitutional avoidance in this case would be profitless, and the Court decides both the federal and state constitutional issues below.

B. The *Lemon v. Kurtzman* Analysis

In Lemon v. Kurtzman, 403 U.S. 602 (1971), the Supreme Court articulated the test to be applied to governmental actions to determine their constitutionality under the Establishment Clause of the First Amendment to the U.S. Constitution. "In order to pass constitutional muster, [challenged government action] must (1) have a secular purpose; (2) have a primary effect which neither advances nor inhibits religion; and (3) not foster excessive state entanglement with religion." Vernon, 27 F.3d at 1396. "In recent years, the Supreme Court essentially has collapsed these last two prongs to ask whether the challenged governmental practice has the effect of endorsing religion." Trunk, 629 F.3d at 1106 (internal quotation marks omitted). A challenged practice must survive all three prongs of the Lemon analysis in order to be held constitutional. Vernon, 27 F.3d at 1396-97 (citing Edwards v. Aguillard, 482 U.S. 578, 583 (1987)). Below, the Court analyzes whether Lake Elsinore's memorial satisfies the

: 
Initials of Preparer     PMC

Case 5:13-cv-00989-SVW-OP   Document 85   Filed 02/25/14   Page 8 of 20   Page ID #:1099

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

Lemon test.³

### 1. Lake Elsinore's Use of the Cross Lacks a Predominantly Secular Purpose

The government's display of an object with religious significance must have a purpose that is "predominantly secular in nature." Trunk, 629 F.3d at 1108 (citing Lemon, 403 U.S. at 612). If objects associated with religion are instead displayed primarily for religious purposes, the government sends the impermissible message that certain religious groups are favored over others, or that religion is favored over nonreligion. See McCreary County, Ky. v. American Civil Liberties Union of Ky., 545 U.S. 844, 860 (2005) ("When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality.").

When a symbol generally associated with religion is included as part of a larger display, the relevant question is whether the government had a predominantly secular purpose for including the religious symbol within the context of the larger setting. For example, in Lynch the Supreme Court analyzed the constitutionality of a city's holiday display, which included a Santa Claus house, reindeer pulling Santa's sleigh, a Christmas tree, and a crèche. Lynch v. Donnelly, 465 U.S. 668, 681 (1984). The Court found that there was a secular purpose for the display of the religiously associated crèche. Id. at 680-61. The crèche depicted the origins of Christmas, which was a legitimate secular purpose within the scope of the larger display that sought to celebrate the history of an event "long recognized as a National Holiday." Id. at 680-81.

---

³ In Van Orden v. Perry, 545 U.S. 677 (2005), the Supreme Court established an "exception" to the Lemon test "in certain borderline cases regarding the 'constitutionality of some *longstanding* plainly religious displays that convey a historical or secular message in a non-religious context.'" Trunk, 629 F.3d at 1107 (quoting Card v. City of Everett, 520 F.3d 1009, 1016 (9th Cir. 2008) (emphasis added)). The Court in Van Orden addressed the constitutionally of a forty-year-old Ten Commandments monument on the grounds of the Texas state capitol. Rather than applying Lemon, Justice Breyer's controlling concurrence relied on a range of factors, including "the monument's purpose, the perception of that purpose by viewers, the extent to which the monument's physical setting suggest[ed] the sacred, and the monument's history." Trunk, 629 F.3d at 1107 (citing Van Orden, 545 U.S. at 701-03 (Breyer J., concurring)). The Van Orden framework incorporates many of the same factors utilized in the Lemon analysis, and to that extent this Court looks to the reasoning adopted there. However, because the Lake Elsinore memorial is not the type of longstanding memorial that was at issue in Van Orden, the Court applies the Lemon test.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

Similarly, in Allegheny the Supreme Court addressed the constitutionality of a holiday display featuring an eighteen-foot menorah, a forty-five foot Christmas tree, and a sign saluting liberty. Id. at 582. A majority of the Court held that although the menorah was generally a religious symbol, that in the context of the larger display of secular holiday symbols, the menorah helped convey the city's "secular recognition of different traditions for celebrating the winter-holiday season." Id. at 620. In a concurring opinion, Justice O'Connor also noted that the religiously affiliated menorah, in conjunction with the Christmas tree and the sign saluting liberty, communicated a secular message of religious pluralism and freedom. Id. at 633-34.

In both Lynch and Allegheny, the religious symbols not only served a secular purpose, but they also served a secular purpose that could not easily be accomplished without a religious symbol. The origins of Christmas are undoubtedly Christian, and thus the use of a Christian symbol to represent that history was legitimate in Lynch. Similarly, in Allegheny, it would not be easy to communicate a message of religious pluralism without using religious symbols like the menorah. In contrast, courts have held that the use of religious symbols where nonreligious symbols will suffice generally evinces a religious purpose. See Greater Houston Chapter of Am. Civil Liberties Union v. Eckels, 589 F. Supp. 222, 234 (S.D. Tex. 1984) (holding that a city's use of cross and Star of David statues in a veterans' memorial was for a religious purpose in part because the memorial could have served its intended purpose of honoring veterans without the use of religious symbolism); Jewish War Veterans of U.S. v. United States, 695 F. Supp. 3, 14 (D.D.C. 1988) ("The use of a cross as a memorial to fallen or missing servicemen is a use of what to some is a religious symbol where a nonreligious one likely would have done as well.").

When the government uses religious symbols or requires religious instruction, the Supreme Court has placed the burden on the government to articulate a predominantly secular purpose for using the symbols under Lemon. See McCreary, 545 U.S. at 870-72 (holding that the government failed to articulate a legitimate secular purpose for the display of the Ten Commandments in county courthouses); Edwards v. Aguillard, 482 U.S. 578, 585 (1987) (noting that the government had "identified no clear secular purpose" for a state law that forbid public schools from teaching evolution unless accompanied by instruction of "creation science"); Stone v. Graham, 449 U.S. 39, 41-42 (1980) (holding that the government had failed to provide a legitimate secular purpose for displaying the Ten Commandments in public classrooms).

In the instant case, there is no evidence as to why the City of Lake Elsinore initially chose to include a Latin cross on their veterans' memorial. Although the cross serves as a tombstone, a religious symbol is not necessary to mark a grave, and like Eckels and Jewish War Veterans, the use of a religious symbol where one is not necessary evidences a religious purpose. However, even assuming Lake

| | : | |
|---|---|---|
| | Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

Elsinore originally included the cross for a secular purpose, the Court must examine whether the relevant government decision makers abandoned their neutrality in adopting the cross design, and acted with the "intent of promoting a particular point of view in religious matters." Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 335 (1987); see Harris v. City of Zion, Lake Cnty., Ill., 927 F.2d 1401, 1411 (7th Cir. 1991) (holding that a city council did not abandon its neutrality when it adopted a school child's design for the city seal, which included a cross, because the evidence showed that the city council adopted the design because of its appealing art work, and there was no evidence to suggest that the city sought to encourage Christianity with the adoption and use of the seal).

Here, there is strong evidence that at the October 23, 2012 Lake Elsinore City Council meeting, multiple City Council members expressed a predominantly religious interest in keeping the cross on the memorial. Responding to members of the community who expressed legal concerns about including the cross, Mayor Pro Tem Hickman said "I feel sorry for us that we as Christians cannot show the cross because of the First Amendment. Okay. It really is a shame that our society, to me, is leaning that way." (Id. 43:19-44:1). Later in resisting a motion to continue a vote on the memorial until other designs were considered, Mr. Hickman added: "I'm not going to sit here and wait for people to denigrate my beliefs, okay. . . . Let them just present their designs. We don't have to change it." (Id. 51:6-8). Council Member Melendez added that "it is a sad reflection on our society when as a Christian nation, one of the principles upon which we were founded is something that we are forced to hide." (Id. 43:19-44:1; 45:9-20). And in response to the motion to continue the vote, she later stated: "You know what . . . I think at some point you have to take a stand. I'm sorry. I just think you do. And I'm going to make a substitute motion that we approve this project as is and where it is." (Id. 54:15-19).

At the November 13, 2012 council meeting, Council Member Magee also expressed an intent to keep the cross because of its religious symbolism. He stated immediately prior to casting his vote to approve the memorial that what "got to [him] the most" was the public testimony of Deborah Rodriguez, who spoke about "her cross and her time served [in the military] and her son." (Transcript, 83: 7-10). Ms. Rodriguez had told the Council that "the cross" made her proud to serve her country, "which was founded on Christianity," and that "God is the cross for me. It could be other things to other people." (Id. at 20-24).

"Public comments of [a display's] sponsors" is important evidence to consider in assessing government purpose. See McCreary, 545 U.S. at 862 (citing Edwards v. Aguillard, 482 U.S. 578, 594-95 (1987)). And similar public statements of religious purpose by government sponsors have been held to show an endorsement of religion in violation of the Establishment Clause. See Green v. Haskell Cnty. Bd. Of Comm'rs, 568 F.3d 784, 801 (10th Cir. 2009). In Green, the county board approved a

| | : | |
|---|---|---|
| | Initials of Preparer | PMC |

Case 5:13-cv-00989-SVW-OP Document 85 Filed 02/25/14 Page 11 of 20 Page ID #:1102

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

monument featuring the Ten Commandments and the Mayflower Compact. Id. at 790. Although the board members did not originally state why they approved the monument, two of the three board members later defended the monument for religious reasons, making statements such as: "That's what we're trying to live by, that right there." "The good Lord died for me. I can stand for him. And I'm going to." "I'm a Christian and I believe in this. I think it's a benefit to the community." "I won't say that we won't take it down, but it will be after the fight." Id. at 801. The court in Green held that the reasonable observer would have been aware of these comments and would have concluded that the county board's enactment of the monument reflected an endorsement of religion.

      Here, as in Green, the public comments show that for a majority of the five-person Lake Elsinore City Council, the purpose for including the cross on the memorial was to symbolize their religion and the Country's status as a Christian nation. Such comments reflect an abandonment of government neutrality in adopting the cross design, and an "intent of promoting a particular point of view in religious matters." Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 335 (1987).

                a. Lake Elsinore's Suggestion that the Purpose of Including the Cross is to Portray a World War II Cemetery is Merely a Litigation Position

      Although Lake Elsinore does not offer a secular purpose for including the Latin cross in the original memorial design, it does contend that the second iteration of the design, which included multiple Latin crosses and Stars of David, had a predominantly secular purpose: to depict a historic European military cemetery of the World War II era. Such cemeteries, in particular the American War Cemetery near Omaha Beach, Normandy, are well known for the image of "row upon row of small white crosses [and Stars of David] amongst the poppies" commemorating fallen soldiers. Trunk, 629 F.3d at 1113.

      The Court does not need to decide, however, if this historic use of the Latin cross and Star of David would qualify as a predominant secular purpose under Lemon. In determining a government's purpose for using religious symbols, the Supreme Court has noted that the "world is not made brand new every morning," and courts must take into account the purposes underlying past actions in addition to the purposes stated for subsequent actions. McCreary, 545 U.S. at 866 & n.14. "Just as Holmes's dog could tell the difference between being kicked and being stumbled over, it will matter to objective observers whether posting [a display with religious symbols] follows on the heels of displays motivated by sectarianism, or whether it lacks a history demonstrating that purpose." Id. at 866 n.14.

      In McCreary, two counties put up large framed copies of the Ten Commandments in high traffic

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

areas of their respective courthouses.  Id. at 851.  In one of the counties, the Commandments were hung in a ceremony presided over by the county Judge-Executive, who called the Commandments "good rules to live by," and recounted the story of an astronaut who became convinced that "there must be a divine God" after viewing the Earth from the moon.  Id.  The Judge-Executive was accompanied by the pastor of his church, who called the Commandments a "creed of ethics."  Id.  The legislative bodies of each county also passed resolutions stating that the Ten Commandments are "the precedent legal code upon which the civil and criminal codes of . . . Kentucky are founded," and that the "Founding Father[s] [had an] explicit understanding of the duty of elected officials to publicly acknowledge God as the source of America's strength and direction."  Id. at 853.

The counties' Ten Commandment displays prompted legal challenge, and an injunction was ordered requiring their removal.  Id. at 854.  After the injunction was entered, the counties installed a modified display in each courthouse.  Id. at 855.  The new displays consisted of nine framed documents of equal size, one of them including the Ten Commandments, and the others including copies of the Magna Carta, the Declaration of Independence, the Bill of Rights, the lyrics of the Star Spangled Banner, the Mayflower Compact, the National Motto, the Preamble to the Kentucky Constitution, and a picture of Lady Justice.  Id. at 855-56.  The collection was entitled "The Foundations of American Law and Government Display," and each document came with a statement about its historical and legal significance.  Id. at 856.  The counties cited several new purposes for the displays, including a desire to "educate the citizens of the count[ies] regarding some of the documents that played a significant role in the foundation of our system of law and government."  Id. at 871.

In reviewing the constitutionality of the modified displays, the Supreme Court found the counties new statements of purpose to be only a "litigating position."  Id. at 871.  The Court noted that a government's secular purpose "has to be genuine, not a sham," and that purpose must be determined by an "objective observer" who is "presumed to be familiar with the history of the government's actions and competent to learn what history has to show."  Id. at 864, 866.  Applying these principles, the Court noted that the counties' modified displays came only months after the patently religious displays, that the displays sectarian history cast doubt on the authenticity of the counties purported secular purposes, and that the modified displays continued to feature a number of religious quotes from the Ten Commandments.  Id. at 866 n.14, 871-72.

Similar to McCreary, the City of Lake Elsinore's secular purpose for the veterans' memorial must be genuine, and must be examined in light of the history of the memorial.  The original veterans' memorial display depicted a solider kneeling before a single cross gravestone. (Trial Ex. 5-1).  It was only after members of the community complained about the legality of including the cross that the Design Committee decided to add a row of crosses and Stars of David in order to make the design look

|   |   | : |   |
|---|---|---|---|
|   | Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

like a World War II memorial. Prior to the Design Committee's modifications, the City Council had never expressed an interest in having a World War II memorial. And in fact, the Council had already rejected a proposal for a memorial that would be limited to veterans of certain wars. The original impetus for the City's veterans' memorial was the death of a serviceman from the community who was killed in Afghanistan. (Melendez Decl., ¶ 2). Yet rather than only honoring veterans from Afghanistan, on April 24, 2012, the City Council decided that a memorial should be built that would honor *all* veterans. (Id.). The Council's sudden shift to a desire for a World War II memorial seems inconsistent with the Council's original purpose.

The addition of the rows of crosses and Stars of David also came only one month after members of the City Council had vocalized a commitment to keeping the cross for religious reasons. As discussed above, Mayor Pro Tem Hickman expressed that he was disappointed as a Christian with the requests to remove the cross from the original design, and Council member Melendez stated that it was a sad reflection on society that as a Christian nation the cross could not be displayed. (Transcript, 43-54). Even after the memorial display was modified to resemble a World War II cemetery, Council member Magee stated that he supported the design in part because of public testimony from a veteran that the cross made her "proud to serve her country, which was founded on Christianity." (Transcript, 20-24).

McCreary and other Establishment Clause precedents "sensibly forbid an observer 'to turn a blind eye to the context in which [a] policy arose.'" McCreary, 545 U.S. at 866 (quoting Santa Fe Indep. School Dist. v. Doe, 530 U.S. 290, 315 (2000)). Here, the comments made at the October 23 Council meeting, as well as the eleventh-hour attempt to articulate a secular purpose for the City's decision to include the Latin crosses and the Stars of David, demonstrate that Lake Elsinore's desire to have a historical World War II memorial was only a litigating position. Council Member Menlendez's statements at the November 13, 2012 Council meeting that the revised memorial display had "nothing to do with religion" and "no matter how long and how many different ways you try to make this a religious issue, it is not," (Transcript, 52:22-53), simply cannot be squared with the Council's prior statements. Therefore, the Court determines that Lake Elsinore has not established a predominantly secular purpose for including the cross on the memorial.

### 2. The Principal Effect of Lake Elsinore's Memorial is to Advance Religion

Because the City of Lake Elsinore has failed to show a predominant secular purpose for including a cross in the memorial, the memorial violates the Lemon test. See Newdow v. Rio Linda Union School Dist., 597 F.3d 1007, 1017 (9th Cir. 2010) (noting that Lemon requires that government action satisfy all three prongs: having a secular purpose, a primary effect that does not advance religion,

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

and an absence of excessive government entanglement). Because the memorial violates Lemon, the Court concludes that the memorial is prohibited by both the U.S. Constitution's Establishment Clause and California's Establishment and No Preference Clauses. However, even if Lake Elsinore had shown a predominant secular purpose for its use of religious symbols in the memorial, the Court finds that the primary effect of the memorial is also to advance religion. Thus, the memorial independently fails the Lemon test under the second prong.

Under Lemon, government action is prohibited if it has the "principal or primary effect" of advancing or disapproving of religion. See Lemon, 403 U.S. at 612; Am. Family Ass'n. Inc. v. City and Cnty of San Francisco, 277 F.3d 1114, 1122 (9th Cir. 2002). "Governmental action has the primary effect of advancing . . . religion if it is 'sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.'" Vasquez v. Los Angeles Cnty., 487 F.3d 1246, 1256 (9th Cir. 2007) (quoting Brown v. Woodland Joint Unified Sch. Dist., 27 F.3d 1373, 1378 (9th Cir. 1994)); see also Trunk, 629 F.3d at 1109 ("By 'endorsement,' we are not concerned with all forms of government approval of religion--many of which are anodyne--but rather those acts that send the stigmatic message to nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members.'" (quoting Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 309-10 (2000))). As with the purpose inquiry, in asking whether a government action is likely to be perceived as an endorsement of religion, the Court examines the issue from the perspective of an "informed and reasonable observer who is familiar with the history of the government practice at issue." Id. at 1110 (internal quotation marks omitted).

In this case, the same religious statements by City Council members that showed a religious purpose for the memorial also contribute to the perception that adherents of Christianity are favored members of the Lake Elsinore community. For example, Mayor Pro Tem Hickman's statement that "as [a] Christian[], he was sorry the cross could not be displayed," and Council Member Magee's statement before voting to approve the cross that what "got to [him] the most" was the public testimony of Deborah Rodriguez, who spoke about how the cross made her proud to serve her country, "which was founded on Christianity," would cause a reasonable observer to infer that the City Council favored Christianity over other religions and non-religion.

In addition to the City Council's statements, the actions and statements of multiple members of the Design Committee and the community at large during consideration of the memorial also contribute to the perception that the memorial will be viewed as endorsing religion. In analyzing the effect of the memorial, these statements are probative. See Trunk, 629 F.3d at 1119-20 & n.19. In Trunk, after certain groups brought suit to remove a Latin cross from a veterans' memorial, members of the

| | : | |
|---|---|---|
| | Initials of Preparer | PMC |

Case 5:13-cv-00989-SVW-OP   Document 85   Filed 02/25/14   Page 15 of 20   Page ID #:1106

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

community in favor of keeping the cross publicly characterized the campaign as a "spiritual battle."  Id. One active proponent of keeping the cross, a local law center, declared that "Christ won the war on Calvary.  These are just kind of mop-up battles. . . ."  Id.  Other Christian advocacy groups launched petition campaigns to save the cross, and at their meetings the cross's importance as a Christian symbol was invoked, and proponents of the cross denounced their opponents as "Satanists" or "hate[rs] of Christianity."  Id.  Still others referred to the need to save the cross because it symbolized the history of Christianity in America."  Id.

      In determining that the principal effect of the cross in Trunk was to advance Christianity, the Ninth Circuit relied in part on these statements, noting that "[t]he starkly religious message of the Cross's supporters would not escape the notice of the reasonable observer."  Id. at 1120.  The court noted that although this evidence may not be relevant to congressional purpose, it "cannot be ignored in assessing the history and context of the Cross" in determining the *effect* of the memorial on the reasonable viewer.  Id. at 1119 n. 19.

      As in Trunk, in the instant case the actions and statements of members of the community reflect a determination to include the cross on the Lake Elsinore memorial as a Christian symbol.  Eight members of the community spoke at the November 13, 2012 Council meeting, some wearing large, visible, crosses around their necks to show support for keeping the cross on the memorial.  (Trial Ex. A). Ms. Hohenadl, a member of the Design Committee, wore such a cross and spoke in favor of keeping the cross, emphasizing how "[o]ur ancestors came to this country with their Christian Judeo faiths." (Transcript, 60-61).  A few days before the Council meeting, she had also sent an email to other members of the Design Committee stating that "I am afraid if we do not attend the Lake Elsinore City Council meeting . . . we may lose any religious symbols on the memorial."  (Trial Ex. 20).

      Another member of the community spoke at the Council meeting about how the cross symbolized God for her, and stated that the "handful of people who disagree [with having the cross on the memorial] probably never served a day in uniform, never served this country, never served what this country was founded for, [and] never served what we believe in."  (Transcript 62:17-63:610).  Similarly, after one individual spoke out against including the cross on the memorial because she felt it excluded veterans of other faiths, a cross supporter stated that "[f]or so few in this city--and I mean few . . . to think that they're going to have the power and not have been in the military, I don't know where they came from. They must have come from a third-world country and come over here and just want to start stuff; . . . [t]hese people need to go and find a place to live other than America."  (Id. 68-69:19).  These public comments from the cross's supporters were all accompanied by loud applause from other members of the community in attendance.  (Trial Ex. A).

|  |  | : |  |
|---|---|---|---|
|  | Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

The Supreme Court has stated that two of the basic purposes of the First Amendment Religion Clauses are to "assure the fullest possible scope of religious liberty and *tolerance* for all," Van Orden, 545 U.S. at 698 (Breyer, J., concurring) (emphasis added) (quoting School Dist. of Abington Township v. Schempp, 374 U.S. 203, 305 (1963)), and to "avoid that divisiveness based upon religion that promotes social conflict." Id. (citing Zelman v. Simmons-Harris, 536 U.S. 639, 717-29 (2002) (Breyer, J., dissenting)). Here, the statements from Design Committee members, and other members of the community, as well as the overall atmosphere at the November 13, 2012 Council meeting sent a powerful message that those who considered the cross to be inappropriate were not welcomed, and that the cross was a religious symbol worth fighting for. The City Council made no attempt to distance itself from these statements. Rather, Council member Magee publicly noted that his decision to vote in favor of the cross was based on the public testimony. A reasonable observer would not consider this support for the cross as an anodyne approval of religion, Trunk, 629 F.3d at 1109, but rather a "stigmatic message to nonadherents that they are outsiders." Id. (internal quotation marks omitted); see also Van Orden, 545 U.S. at 703 (Breyer, J., concurring) (distinguishing Van Orden, where there were no challenges to the Ten Commandments monument on the grounds of the Texas state capitol for forty years, from McCreary, 545 U.S. 869-73, where "the short (and stormy) history of the courthouse Commandments' display demonstrates the substantially religious objectives of those who mounted them, *and* the effect of this readily apparent objective upon those who view them) (emphasis added).

In addition to the publicly expressed religious sentiments in favor of Lake Elsinore's memorial, the physical appearance of the memorial also has the principal effect of advancing religion. As discussed above, the Lake Elsinore memorial design prominently features a Latin cross. Because of the Latin cross's strong ties to Christianity, even when a cross occupies only one part of a lager display, courts have almost unanimously held that its effect is to communicate that the display as a whole endorses religion. See, e.g., Harris v. City of Zion, Lake Cnty. Ill., 927 F.2d 1401, 1403, 1412 (7th Cir. 1991) (holding that a city seal with four quadrants depicting a leaf, a water tower, a school, and a building with a cross in front of it violated the establishment clause because its effect was to express approval of the Christian religion); Robinson v. City of Edmond, 68 F.3d 1226, 1228 (10th Cir. 1995) (holding that a similar four quadrant seal with a cross had the principal effect of advancing religion).

Further, because of the Latin cross's historic and well-known connection with Christianity, the Ninth Circuit has also expressly cautioned against its use for an "ancillary meaning as a symbol of military service, sacrifice, and death." Trunk, 629 F.3d at 1111. For example, in Ellis the Ninth Circuit noted that although the cross can be used to pay homage to the deceased, it remains the symbol of only one religion, and thus gives the effect of memorializing only the Christian deceased. Ellis, 990 F.2d at 1527 (holding that even though a cross was "dedicated to veterans of World Wars I & II," it violated California's No Preference Clause). Similarly, in SCSC, Judge O'Scannlain noted that a city's "use of a

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

cross to memorialize the war dead may lead observers to believe that the City has chosen to honor only Christian veterans." SCSC, 93 F.3d at 626 (O'Scannlain, J., concurring).

Lake Elsinore argues that its memorial design is distinguishable from other veterans' memorials that have been found unconstitutional because it attempts to capture a historic image of a World War II cemetery, with two rows of white crosses and scattered Stars of David. Crosses and Stars of David are undeniably components of the imagery of World War II cemeteries such as Normandy. See Salazar v. Buono, 559 U.S. 700, 721-22 (2010) (noting that American soldiers who fell in battle during World War I and World War II are movingly memorialized with "thousands of small crosses in foreign fields"). However, the Court finds that despite the effort to make the memorial historical, the imagery still remains primarily Christian.

The backdrop of the granite rectangle with the semi-circle top that displays the memorial's text and images is dark black. (Trial Ex. 5-2). Against this backdrop, a soaring eagle and an American flag appear in a gray color on the top half of the stone. (Id.). The text of the memorial appears in front of the flag in white, but is somewhat obscured by the flag. (Id.). And in bright white on the bottom half of the black stone, the boldest and most visible elements of the display are the soldier kneeling with his gun in front of the central cross. (Id.). The two rows of additional crosses and Stars of David are smaller, somewhat lighter in color, and in the backdrop to the left of the central cross, and a visitor's eyes are drawn first to the soldier and the central cross. (Id.). Although the cross is a component of the imagery of World War II cemeteries such as Normandy, it remains "a marker of an individual grave, not a universal monument to the war dead." Trunk, 629 F.3d at 1113. Here, the primary emphasis is a Christian grave, which may lead observers to believe that Lake Elsinore is only honoring Christian veterans.

Lastly, even if the memorial is an attempt to display a historic image of a World War II cemetery, its contemporary focus on the cross has proven divisive. In his controlling concurrence in Van Orden, Justice Breyer noted that while the forty-year old monument of the Ten Commandments at issue there indicated a government effort primarily to reflect, historically, the secular impact of a religiously inspired document, that "in today's world, in a Nation of so many different religious and comparable nonreligious fundamental beliefs, a more contemporary state effort to focus attention upon a religious text is certainly likely to prove divisive in a way that [a] longstanding, preexisting monument has not." Id. at 703 (Breyer, J., concurring). This statement proves true in the instant case. Unlike in Van Orden where forty years passed in which the presence of the monument went unchallenged, id. at 702, here citizens of Lake Elsinore and Plaintiff have challenged the veterans' memorial even before its construction. As Barbara Anderson, a resident of Lake Elsinore, said during the November 13, 2012 City Council meeting, "[we] are a [diverse] nation. We're made up of many, many people of many

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

faiths and many of them have died in various wars for us." (Transcript, 64:23-25). Yet the approved Lake Elsinore veterans' memorial only speaks to some.

**IV. CONCLUSION**

The Court concludes that Lake Elsinore's veterans' memorial was designed without a predominantly secular purpose, and that its principal effect is to advance religion. Therefore, the memorial design violates the <u>Lemon</u> test. Because the memorial design violates <u>Lemon</u>, the Court concludes that the memorial violates both the U.S. Constitution's Establishment Clause and California's Establishment and No Preference Clauses. The Court does not consider whether the memorial violates California's No Aid to Religion Clause.

:

Initials of Preparer      PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

**APPENDIX A:**



: 
Initials of Preparer           PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:13-cv-00989-SVW-OPx | Date | February 25, 2014 |
|---|---|---|---|
| Title | American Humanist Association et al. v. City of Lake Elsinore et al. | | |

**APPENDIX B:**



| | : |
|---|---|
| Initials of Preparer | PMC |